No. 25-20113

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

**Brad Miller,**

*Plaintiff – Appellant*

**v.**

**Anadarko Petroleum Corporation Change of Control Severance Plan and Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee,**

*Defendants – Appellees*

———————————

On Appeal from the United States District Court for the
Southern District of Texas
Case No. 4:23-CV-03034

———————————

**Brief of Plaintiff – Appellant**

———————————

Nick Lawson
Lawson & Moshenberg PLLC
2301 Commerce Street, Suite 200
Houston, Texas 77002
T: (903) 316-9155

*Counsel for Plaintiff – Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-20113, *Miller v. Anadarko Petroleum Corporation Change of Control Severance Plan et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff – Appellant:**
Brad Miller

**Counsel for Plaintiff – Appellant:**
Nicholas Lawson
Avi Moshenberg
Lawson & Moshenberg PLLC

**Defendant – Appellant:**
Anadarko Petroleum Corporation Change of Control Severance Plan
Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee

**Counsel for Defendant – Appellant:**
Shauna Johnson Clark
Nathan Ochsner
Kristina Marie Williams
Kimberly Cheeseman

By: */s/ Nicholas R. Lawson*
Nicholas R. Lawson

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff – Appellant Brad Miller respectfully requests oral argument. Given the complexities of this case, oral argument will aid the Court in reaching its decision.

## Table of Contents

Certificate of Interested Persons ................................................................ ii

Statement Regarding Oral Argument ...................................................... iii

Table of Contents ..................................................................................... iv

Table of Authorities ............................................................................... viii

Jurisdictional Statement ............................................................................1

Issues Presented .........................................................................................2

Statement of the Case................................................................................3

1. Miller is Anadarko's Director of Regulatory Affairs and Advocacy for the Gulf of Mexico Group..........................................................................3

2. Anadarko's Change of Control Plan provides separation benefits for Miller because his responsibilities and compensation are reduced after Oxy acquires Anadarko.....................................................................................4

3. Miller's responsibilities are reduced or dissolved altogether after the Oxy Acquisiton. ........................................................................................6

4. Miller's new supervisor admits Miller is being pushed out because of his age. 10

5. Miller resigns and requests benefits under the COC Plan….............................11

6. Miller sues Anadarko Petroleum Corporation Change of Control Severance Plan and its Administrative Committee. ...................................................11

7. The Trial Court recognizes a Circuit Split..........................................12

Summary of the Argument......................................................................12

Standard of Review .................................................................................13

Arguments & Authorities........................................................................14

I. The trial court should have reviewed the benefits decision under a *de novo* standard because the Plan only authorizes deference to the Committee to interpret ambiguous, unclear, or implied-but-omitted terms. ...........................................15

    A.     *De novo* review is the general rule. ........................................................15

    B.     This Court should align with the Tenth Circuit finding that the plain language of the Plan only authorizes discretion for the Committee to interpret ambiguous, unclear, or implied but omitted Plan terms. ...........16

    C.     *Gift* does not create a circuit split because its non-precedential and the standard of review was not in dispute. ....................................................18

        *1.*     *Gift does not create discretion for the Committee's benefits decisions because the opinion is non-precedential.* ........................18

        *2.*     *Gift does not create discretion for the Committee's benefits decisions because this Court was not asked to decide whether discretion applied.* ..............................................................................19

II. The Plan entitles Miller to benefits because his duties and responsibilities were diminished after the Acquisition. ........................................................................20

    A.     Miller's expenditure authority is reduced by 99%. ..................................21

        *1.*     *The Plan doesn't exclude temporary reductions in duties or authority from Good Reason.* ..........................................................23

        *2.*     *The Plan does not excuse Good Reason for Covid-19 or other changed economic circumstances.* ...................................................27

    B.     Miller is excluded from building and maintaining trade-organization relationships. .........................................................................................28

        *1.*     *Building and maintaining trade organization relationships was a significant part of Miller's reponsibility before the Acquisition but not after.* .......................................................................................28

        *2.*     *Fluctuating business needs does not excuse Miller's diminished role in selecting and maintaining trade organization relationships from Good Reason.* ...............................................................................31

C.      Miller is removed from executive-level strategy and personnel input over the Gulf of Mexico Asset. ...........................................................32

D.      Miller's compensation is reduced by 4.9%. .............................................35

Conclusion ....................................................................................................37

Certificate of Service .......................................................................................38

Certificate of Compliance ..................................................................................38

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Cytec Indus., Inc.,* 619 F.3d 505 (5th Cir. 2010) ................................31

*Biestek v. Berryhill,* 587 U.S. 97 (2019) ................................................................36

*Bowles v. Quantum Chem. Co.,* 266 F.3d 622 (7th Cir. 2001) ...............................21

*Chacko v. Sabre, Inc.,* 473 F.3d 604 (5th Cir. 2006) .............................................25

*Crowell v. Shell Oil Co.,* 541 F.3d 295 (5th Cir. 2008) .........................................24

*Daubertin v. HCR Manor Care, Inc.,* 373 F.3d 822 (7th Cir. 2004) ......................21

*Dupree v. Younger,* 598 U.S. 729 (2023) ..............................................................14

*Egert v. Connecticut Gen. Life Ins. Co.,* 900 F.2d 1032 (7th Cir. 1990)................26

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989) ......................... 14, 15

*Gift v. Anadarko Petroleum Corp. Change of Control Severance Plan,* No. 23-50862, 2024 WL 4689051 (5th Cir. Nov. 6, 2024) ............................... passim

*Hodges v. Life Ins. Co. of N. Am.,* 920 F.3d 669 (10th Cir. 2019) .........................15

*Hoff v. Amended & Restated Anadarko Petroleum Corp. Change of Control Severance Plan,* No. 23-1361, 2025 WL 400517 (10th Cir. Feb. 4, 2025) ................................................................................................................. passim

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan,* 605 F.3d 789 (10th Cir. 2010)............................15

*McClure v. Vice President, Human Resources, Union Carbide Corp.,* No. H03-0054, 2005 WL 1214645 (S.D. Tex. May 20, 2005) .....................................21

*Meche v. Doucet,* 777 F.3d 237 (5th Cir.), *cert. denied*, 136 S. Ct. 111 (2015) .....22

*Miller v. Anadarko Petroleum Corp. Change of Control Severance Plan,* No. CV 23-3034, 2025 WL 744480 (S.D. Tex. Mar. 7, 2025)........................... passim

*Mobile South, LLC, v. Roswell,* 574 U.S. 293 (2015)..............................................36

*Parkcrest Builders, LLC v. Liberty Mut. Ins. Co.,* 26 F.4th 691 (5th Cir. 2022) .. 13, 14

*Porter v. Lowe's Cos.,* 731 F.3d 360 (5th Cir. 2013) .............................................20

*Pullman-Standard v. Swint,* 456 U.S. 273 (1982) ...................................................22

*Tucker v. Shreveport Transit Mgmt. Inc.,* 226 F.3d 394 (5th Cir. 2000).................24

**Statutes**

28 U.S.C. § 1291 ....................................................................................................1

29 U.S.C. § 1001 ..............................................................................................1, 15

29 U.S.C. § 1104(a) ............................................................................................11

29 U.S.C. § 1132(a)(1)(B) ....................................................................... 11, 21, 26

## JURISDICTIONAL STATEMENT

The district court exercised federal-question jurisdiction because the claims at issue here involve the Employee Retirement Income Security Act of 1974. *See* 29 U.S.C. § 1001, *et seq*. This Court has jurisdiction under 28 U.S.C. § 1291 because the final judgment disposes of all parties' claims, and Miller filed a timely notice of appeal.

## ISSUES PRESENTED

**Issue 1:** The Plan only authorizes discretion over the Committee's decisions interpreting ambiguous, unclear, or omitted (but implied) Plan terms. Here, the Committee and Miller agree that no terms of the Plan are ambiguous, unclear, or omitted (but implied). Is the Committee's benefits decision entitled to discretion?

**Issue 2:** Separation benefits are authorized for employees that experienced "Good Reason" after a change of control event. Good reason is defined as diminished responsibilities, duties, or compensation. After Oxy acquired Anadarko Petroleum Corporation, Miller's expense authority dropped by 99%, he was replaced by a senior Oxy executive in his advocacy role, he was removed as a voting member of the executive leadership committee, and his compensation was reduced by 4.9%. Did Miller experience Good Reason?

STATEMENT OF THE CASE

Miller started at Anadarko in 1985 straight from college.[1] He resigned for Good Reason on June 19, 2020, after 35 years of service.[2] Miller devoted his entire career to Anadarko.

## 1.   Miller is Anadarko's Director of Regulatory Affairs and Advocacy for the Gulf of Mexico Group.

Over his 35 years of service, Miller rose to Director of Regulatory Affairs and Advocacy for Anadarko's Gulf of Mexico Group.[3] In this role, Miller was responsible for:

- *Approving* capital expenditures of up to $8 million for the Gulf of Mexico Group;[4]

- *Advocating* outside by identifying, managing, and consummating new business relationships with trade associations, including advising the regional Vice President on the relationships to foster or create, and how they benefit the company;[5]

- *Counseling* on strategy and personnel input on the Gulf of Mexico Management Committee, which met bi-weekly to make strategic decisions on how to manage the Gulf of Mexico asset, and even promotion and compensation reviews for Gulf of Mexico Group employees;[6]

- *Hiring* a group of five consultants working to evaluate improvements for the Gulf of Mexico asset;[7] and

---

[1] ROA.433.
[2] ROA.524.
[3] ROA.524.
[4] ROA.526.
[5] ROA.525.
[6] ROA.525.
[7] ROA.524.

3

- *Managing* two direct reports—both experts in their respective fields—to carry out his core directives, together with co-management authority over an additional 6 Regulatory Affairs personnel, and 4 consultants, in advocacy and regulatory affairs for the Gulf of Mexico Group.[8]

**2.    Anadarko's Change of Control Plan provides separation benefits for Miller because his responsibilities and compensation are reduced after Oxy acquires Anadarko.**

Anadarko first adopted a severance plan on January 29, 1998.[9] The Plan provided separation benefits to qualifying Anadarko employees if a "Change of Control" occurred. Separation benefits were a formula of salary and other factors.[10] The current Plan was adopted on September 1, 2007.[11] The Plan was amended with a First Amendment adopted on April 15, 2008, a Second Amendment adopted on October 26, 2009, and a Third Amendment Adopted on December 20, 2010.[12] The provisions triggering a right to benefits are contained in Article 4, Separation Benefits:[13]

> 4.1    Right to Separation Benefits.    A Participant shall be entitled to receive Separation Benefits as provided in Section 4.3 if a Change of Control occurs and his or her Employment terminates under a circumstance specified in Section 4.2(a). An additional Change of Control shall not trigger any additional Separation Benefits for the Participant.
>
> 4.2    Termination of Employment.

---

[8] ROA.524.
[9] ROA.334.
[10] ROA.342-43.
[11] ROA.352.
[12] ROA.353-363.
[13] ROA.341.

(a) Terminations Which Give Rise to Separation Benefits Under This Plan.

…

(ii)    A termination for Good Reason during the Applicable Period; provided, that, the Participant terminates his or her Employment within ninety (90) days of such occurrence; …

A "Good Reason" is defined in Article 3 as:[14]

> (s)    Good Reason.  Good Reason shall mean the occurrence of any of the following:
>
> (i)    the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control;
>
> (ii)    the Participant's Base Salary is materially reduced in comparison to the Base Salary enjoyed by the Participant immediately prior to the Change of Control;

As part of the First Amendment, Article 9 of the Plan provides certain discretion to the Plan Administrator in interpreting the plan:[15]

> (g) Effect of Committee Action. The Plan shall be interpreted by the Committee in accordance with the terms of the Plan and their intended meanings. However, the Committee shall have the discretion to make any findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment. The validity of any such findings of fact, interpretation, construction or decision shall not be given de novo review if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious…

---

[14] ROA.339.
[15] ROA.356.

Occidental Petroleum Corporation acquired Anadarko on August 8, 2019 (the "Acquisition"). That the Acquisition qualifies as a "Change of Control" under the Plan is undisputed.

### 3.     Miller's responsibilities are reduced or dissolved altogether after the Oxy Acquisition.

By January 2020, Miller lost hiring and firing authority.[16] Indeed, Miller lost input on hiring and firing.[17] For example, after a five-month investigation into a Staff Regulatory Engineer for not completing work assignments, failing to meet deadlines, insubordination, and inappropriate comments to a female employee, Miller with Human Resources determined the engineer should be fired.[18] But after Miller made the termination decision approved by Human Resources, legacy Oxy employee Andy Kershaw overturned the decision.[19] Similarly, after the Acquisition, Susan Hathcock—formerly a direct report of Miller's who had retired—was hired out of retirement to manage the regulatory team that Miller had previously managed.[20] This is significant not only because Miller was not involved in her re-hiring (as he would've been pre-Acquisition) but also because about 60% of his core responsibilities in managing personnel were later supplanted by Hathcock.[21]

---

[16] ROA.356.
[17] ROA.524-25, 527.
[18] ROA.524-25, 527.
[19] ROA.524-25, 527.
[20] ROA.524-25, 527.
[21] ROA.524-25, 527.

Miller's job responsibilities were diminished other ways too.

By December 11, 2019, Miller was removed from his leadership position on the Gulf of Mexico Management Committee.[22] The Committee was responsible for all major strategy decisions for the Gulf of Mexico Group.[23] Before the Acquisition, Miller sat on the Committee—attending meetings and voting on action items.[24] After the Acquisition, he was permitted to attend weekly staff meetings but was no longer authorized to provide input on strategy and personnel.[25] And beyond the staff meetings, the Committee conducted bi-weekly strategy meetings to decide on special initiatives, strategic initiatives, personnel discussions, and process-improvement initiatives for the Gulf of Mexico asset.[26] But Miller was not included in these meetings, while he would have pre-Acquisition.[27]

Miller was similarly removed from attending the bi-annual regional strategic-planning meeting where two- and five-year targets were set for the Gulf of Mexico asset.[28] And Miller was excluded from Annual Performance Reviews and Merits discussions of all Gulf of Mexico Group personnel.[29] The result, Miller lost all high-

---

[22] ROA.524-25, 527.
[23] ROA.524-25, 527.
[24] ROA.524-25, 527.
[25] ROA.524-25, 527.
[26] ROA.524-25, 527.
[27] ROA.524-25, 527.
[28] ROA.524-25, 527.
[29] ROA.524-25, 527.

level strategy input on the Gulf of Mexico asset, including its personnel, which he enjoyed fully before the Acquisition.

Then on December 16, 2019, Miller lost his most critical role of all—his authority to approve trade organizations with the company.[30] Before the merger, his role was focused on approving crucial trade-organization partnerships, including with top trade organizations like the Offshore Operators Committee, the American Petroleum Institute, the Louisiana Mid-Continent Oil and Gas Association, and the International Association of Geophysical Contractors.[31] He even forged the key contact between the company and the Louisiana Congressional delegation.[32] Partnering with these trade organizations was key to Anadarko's ability to operate in the Gulf of Mexico. Yet these responsibilities were shifted to legacy Oxy employee Tom Janiszewski, Vice President of Land, following the Acquisition.[33]

By April 2020, Miller lost 99% of his expenditure authority. For example, Miller's capital expenditures authority before the Acquisition was $4 million to $8 million, depending on the classification of the project.[34] Capital expenditures cover various items including equipment, licenses, or even software. After the Acquisition, Miller's authority for the same-classified projects plummeted to between $12,500

---

[30] ROA.524-25, 527.
[31] ROA.527-28.
[32] ROA.527-28.
[33] ROA.527.
[34] ROA.526.

and $20,000.[35] Miller's authority to approve contracts went from contract values as high as $2 million down to contract values of only $20,000.[36] Likewise, his pre-Acquisition authority to approve general expenses ranged from $3 million to $6 million, but after the Acquisition it dropped to between $12,500 and $20,000.[37]

Then on April 1, 2020, Oxy reduced Miller's salary by 4.9%.[38] In addition, Miller's bonus amount targets were reduced, deferred compensation benefits were revoked, and stock awards were reduced or eliminated.[39]

In summary, by April 2020, Anadarko reduced Miller's duties and responsibilities from:

- ***approving*** capital expenditures from as high as $8 million before Acquisition to a maximum of $20,000 post-Acquisition;[40]

- ***advocating*** for the company with trade organizations to removing him entirely from managing with them and installing legacy Oxy employee Tom Janiszewski in his place;[41]

- ***counseling*** on strategy and personnel input to dissolving the Gulf of Mexico Management Committee that Miller was a voting member on and replacing it with an Oxy committee where Miller was only invited to staff meetings with no voting authority;[42]

---

[35] ROA.526.
[36] ROA.526.
[37] ROA.526.
[38] ROA.528.
[39] ROA.528.
[40] ROA.526.
[41] ROA.525, 527-28, 609.
[42] ROA.525, 527.

- ***hiring*** direct reports and consultants to having no such authority altogether;[43] and

- ***managing*** direct reports or consultants and to instead being replaced in 60% of his regulatory duties by Susan Hathcock.[44]

Miller's advocacy role was usurped entirely. His regulatory role was replaced by 60%. His expenditure authority was reduced by 99% to a level where Miller could make no expenditure as a practical matter. His compensation was reduced. He was no longer managing the majority of his subordinates. And he lost hiring and firing authority. He was left with essentially no duties or responsibilities.

**4.     Miller's new supervisor admits Miller is being pushed out because of his age.**

On May 13, 2020, Executive Vice President Andy Kershaw called a meeting with Miller to encourage his retirement.[45] Kershaw is a legacy Oxy employee and was Miller's supervisor after the Acquisition.[46] In the meeting, Kershaw claimed that he'd spoken directly with Oxy CEO Viki Hollub and that they both agreed Oxy should encourage older legacy Anadarko employees to retire to make room for younger workers.[47] Kershaw even suggested that Oxy's financial condition was teetering on bankruptcy because of the Covid-19 economic environment and that if

---

[43] ROA.524, 527.
[44] ROA.524, 527.
[45] ROA.524, 527.
[46] ROA.524, 527.
[47] ROA.524, 527.

Miller did not retire soon, he may not be able to enjoy the benefit of his pension.[48]

The insinuation being that an Oxy bankruptcy would jeopardize his pension.

**5.      Miller resigns and requests benefits under the COC Plan.**

With his responsibilities and duties whittled to nearly nothing, and his good

reason clock ticking, Miller did not have any other practical options left. On June

19, 2020, Miller resigned for Good Reason and requested separation benefits.[49]

Admin R. 200. Miller is entitled to $1,403,571 in separation benefits.

**6.      Miller sues Anadarko Petroleum Corporation Change of Control Severance Plan and its Administrative Committee.**

On August 17, 2023, Brad Miller sued Anadarko Petroleum Corporation

Change of Control Severance Plan and its Administrative Committee in the United

States District Court for the Southern District of Texas, Houston Division.[50]

Miller brought two causes of action under the Employee Retirement Income

Security Act of 1974 ("ERISA"). First, he alleged improper denial of benefits under

ERISA § 502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B), claiming that he met the Plan's

requirements for separation of benefits and that the Committee's denial was an abuse

of discretion.[51] Second, he brought a claim for breach of fiduciary duty under ERISA

§ 404(a), 29 U.S.C. 1104(a), asserting that the Committee conducted a biased and

---

[48] ROA.524, 527.
[49] ROA.533.
[50] ROA.10.
[51] ROA.23.

outcome-driven investigation, misrepresented plan terms, and acted contrary to the interests of Plan participants.[52]

## 7.    The Trial Court recognizes a Circuit Split.

On March 7, 2025, the trial court granted summary judgment for Defendants, Anadarko Petroleum Corporation Change of Control Severance Plan and its Administrative Committee, and denied Brad Miller's cross-motion for judgment.[53] The Court noted in opening remarks that "[t]he Fifth and the Tenth Circuit Courts of Appeals have read the same Plan language differently and have reached different results on similar claims."[54] The Court followed this Court's unpublished guidance in Gift deciding that the Committee did not abuse its discretion in concluding that Miller had not experienced a "Good Reason" event. Final judgment was entered in favor of Defendants,[55] and this appeal followed.[56]

### SUMMARY OF THE ARGUMENT

Miller is entitled to separation benefits for two reasons.

First, the unambiguous Plan terms confirm the standard of review for benefits determinations under this Plan is *de novo* where no Plan terms are ambiguous,

---

[52] ROA.23-24.
[53] ROA.1075; *Miller v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. CV 23-3034, 2025 WL 744480, at *1 (S.D. Tex. Mar. 7, 2025) (Rosenthal, J.).
[54] ROA.1075; *Miller v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. CV 23-3034, 2025 WL 744480, at *1 (S.D. Tex. Mar. 7, 2025).
[55] ROA.1099.
[56] ROA.1100.

unclear, or omitted (but inferred). The Committee's benefits decision is not entitled to discretion here because no Plan terms are ambiguous, unclear, or omitted. The District Court's determination that the Committee's benefits determination was entitled to discretion was therefore without authority in the plain language of the Plan. This Court should reverse because the wrong standard of review was used.

Second, the undisputed evidence confirms that Miller experienced Good Reason. The Committee agrees that his expense authority as reduced by 99%. And that he was removed from his advocacy role in establishing trade association relationships. Or that he was removed as a voting member from the management committee. Or even that his compensation was reduced by 4.9% after the acquisition. The Committee's only defenses are that these changes were temporary, or caused by changing economic facts like Covid-19. But these defenses are unsupported by the plain language of the Plan. This Court should not only reverse, but it should render in Miller's favor because the undisputed facts confirm that Miller experienced Good Reason and is entitled to separation benefits.

## STANDARD OF REVIEW

Miller raises two issues in this appeal. The first issue addresses whether the Committee is entitled to discretion in its benefits determination under the plain language of the Plan. The trial court determined that it was. Because this is a question of law, the Court applies a *de novo* standard of review. *Parkcrest Builders, LLC v.*

*Liberty Mut. Ins. Co.,* 26 F.4th 691, 695 (5th Cir. 2022) ("Pure questions of law are reviewed *de novo.*"); *Dupree v. Younger*, 598 U.S. 729, 731–32, (2023). Similarly, Miller challenges the trial court's summary judgment that determined as a matter of law that Miller did not experience Good Reason under the terms of the Plan and was therefore not entitled to separation benefits. "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). For the reasons set forth in this brief, the standard of review for this issue is *de novo* as well. *Id.*

## ARGUMENTS & AUTHORITIES

The Court should reverse the trial court's judgment because the Plan's plain text entitles Miller to separation benefits. Miller experienced several Good Reason events following the Acquisition when his job duties, responsibilities, and pay all diminished. The trial court did not reach that straightforward conclusion because it felt compelled by this Court's Gift decision to defer to the Committee's discretion. With this case, the Court can reaffirm the uncontroversial proposition the plain language of a contract controls.

**I.      The trial court should have reviewed the benefits decision under a *de novo* standard because the Plan only authorizes deference to the Committee to interpret ambiguous, unclear, or implied-but-omitted terms.**

The threshold question here is whether the trial court reviews the Committee's benefits determination *de novo*, or for an abuse of discretion. The trial court below reviewed the Committee's decision for an abuse of discretion. But the plain language of the Plan only authorizes discretion where the Committee interprets ambiguous, unclear, or implied but omitted terms of the Plan. Here, the Plan is unambiguous. The Tenth Circuit agrees that *de novo* review applies to this Plan under these circumstances. This Court should as well.

**A.      *De novo* review is the general rule.**

The Supreme Court has held that "a denial of benefits' covered by [the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.] 'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to continue the terms of the plan.'"[57] Put differently, unless the parties specifically agreed otherwise, courts apply *de novo* review.[58] That means we look first to the

---

[57] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[58] *See Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 677 (10th Cir. 2019) ("It is only when a plan specifically confers discretion to decide the question on which the benefit denial is based that the arbitrary and capricious standard applies." (internal brackets and citation omitted).

Plan's plain language to determine if the Parties agreed to review different than de novo. The Tenth Circuit has done so interpreting this same Plan.

**B.** **This Court should align with the Tenth Circuit finding that the plain language of the Plan only authorizes discretion for the Committee to interpret ambiguous, unclear, or implied but omitted Plan terms.**

The trial court understood that "[t]he Fifth and the Tenth Circuit Courts of Appeals have read the same Plan language differently and have reached different results on similar claims."[59] The Tenth Circuit found that the plain language of the Plan conferred deference to the Committee's interpretation of ambiguous, unclear, or implied but omitted Plan terms.[60] This Court applied discretion to the Committee under these same Plan terms in the unpublished *Gift* opinion.[61] But as set forth below, *Gift* is neither precedential nor persuasive.

Separation benefits are awarded under the Plan for employees that experience "Good Reason."[62] Good Reason is a defined term:[63]

---

[59] ROA.1075; *Miller v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. CV 23-3034, 2025 WL 744480, at *1 (S.D. Tex. Mar. 7, 2025).

[60] *Hoff v. Amended & Restated Anadarko Petroleum Corp. Change of Control Severance Plan*, No. 23-1361, 2025 WL 400517, at *4-5 (10th Cir. Feb. 4, 2025).

[61] *Gift v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. 23-50862, 2024 WL 4689051 (5th Cir. Nov. 6, 2024).

[62] ROA.341.

[63] Good Reason is triggered by six different criteria, but Miller qualifies under (i) and (ii). ROA.339.

> **(s)**   _Good Reason._   Good Reason shall mean the occurrence of any of the following:
>
>   **(i)**   the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control;
>
>   **(ii)**   the Participant's Base Salary is materially reduced in comparison to the Base Salary enjoyed by the Participant immediately prior to the Change of Control;

No Party argues that Good Reason is ambiguous or unclear. Good Reason is explicitly defined. It is satisfied when a Participant's duties and responsibilities are materially and adversely diminished, or when base salary is materially reduced, following a Change of Control.

The Plan Administrator must also interpret the plan "in accordance with the terms of the Plan and their intended meanings."[64] And the Plan Administrator only has "discretion to make any findings of fact needed in the administration of the Plan" or "to interpret or construe ambiguous, unclear or implied (but omitted) terms…"[65] The Plan doesn't argue that any term is ambiguous, unclear, or that any implied but omitted terms govern Miller's claim. So, the Plan Administrator's denial is not entitled to deference and should be reviewed _de novo_.

The Tenth Circuit agrees. In _Hoff_, the Tenth Circuit found that "Section (g) of the Plan provided Oxy "the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion [it] deem[ed] to be appropriate in its sole

---

[64] ROA.356.
[65] ROA.356.

judgment," and that therefore "for unambiguous and clear terms, the Plan—and precedent—dictates that we apply de novo review."[66] Miller makes the same argument here that the Tenth Circuit adopted. Nothing in the Plan documents grants deference to construe the Plan's unambiguous terms. No Party in this case argues that any of the Plan terms are ambiguous. Much less that the defined term "Good Reason" is ambiguous. The Tenth Circuit got it right. And following the reasoning in *Hoff*, this Court should apply a *de novo* standard as well.

### C.    *Gift* does not create a circuit split because its non-precedential and the standard of review was not in dispute.

While "[t]he Fifth and the Tenth Circuit Courts of Appeals have read the same Plan language differently and have reached different results on similar claims,"[67] this Court need not create a Circuit Split. This Court can avoid one by following *Hoff* and acknowledging that Gift is both non-precedential and resolves a different legal issue aside from the Committee's discretion.

### 1.    *Gift* does not create discretion for the Committee's benefits decisions because the opinion is non-precedential.

First, *Gift* is a Fifth Circuit *per curiam* opinion.[68] The opinion explicitly states "[t]his opinion is not designated for publication. *See* 5th CIR. R. 47.5." In turn, Fifth

---

[66] *Hoff*, 2025 WL 400517, *4.
[67] ROA.1075; *Miller v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. CV 23-3034, 2025 WL 744480, at *1 (S.D. Tex. Mar. 7, 2025).
[68] *Gift v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. 23-50862, 2024 WL 4689051 (5th Cir. Nov. 6, 2024).

Circuit Rule 47.5.4 (Unpublished Opinions Issued on or After January 1, 1996) provides "Unpublished opinions issued on or after January 1, 1996, *are not precedent*[.]" 5th CIR. R. 47.5. So the Court is not bound by *Gift*.

In any event, *Gift* should also be disregarded because the Court wasn't asked to decide whether the Committee's decision was entitled to discretion. And factually, *Gift* was not as clear on good reason as this case or *Hoff*.

> **2.     *Gift does not create discretion for the Committee's benefits decisions because this Court was not asked to decide whether discretion applied.***

The decision in *Gift* is unhelpful not only because it is non-precedential but also because this Court did not review whether the Committee's decision was entitled to discretion. The Court wasn't asked to. Nor did the Court need to. In *Gift*, both parties agreed an abuse of discretion standard applied.[69] In fact, the Parties had no dispute over whether the Plan's interpretation was "legally correct."[70] So this Court wasn't asked to decide whether the Commission's decision was entitled to discretion, or if not broadly applied in what context it discretion would be appropriate. Nor was the reduction in responsibilities or duties in Gift similar to this case or *Hoff*.

---

[69] *Gift*, 2024 WL 4689051, at *3 ("Here, Gift acknowledges that the "[P]lan expressly confers discretion on the plan administrator to construe the plan's terms.").

[70] *Id*. at ("First, Gift does not challenge whether the Plan's interpretation was legally correct, nor does he contend that the district court erred in finding that it was legally correct.").

This case is different from *Gift* and similar to *Hoff*. Miller disputes the standard of review – just like *Hoff* did. And just like in *Hoff*, the Committee doesn't argue that any terms of the Plan, much less "Good Reason," are ambiguous. And Miller's diminished responsibilities and duties are closer to *Hoff's* than *Gift's*. For these reasons, *Hoff* offers better guidance. And the Plan should not get deference in this benefits determination. Certainly not based on *Gift*.

## II.   The Plan entitles Miller to benefits because his duties and responsibilities were diminished after the Acquisition.

The trial court affirmed the Committee's benefits decision not because it was legally correct, but because it "[fell] somewhere on the continuum of reasonableness – even if on the low end."[71] Largely, the trial court concluded that because the Committee appeared to acknowledge all of Miller's arguments in the benefits appeal process that whatever decision it reached thereafter was reasonable.[72] But the Committee's decision was unreasonable because it was unmoored from the plain language of the Plan.

Miller is entitled to separation benefits because he experienced several Good Reason events following the Acquisition. His expense authority was reduced 99%.[73]

---

[71] ROA.1096; *Miller v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. CV 23-3034, 2025 WL 744480, at *11 (S.D. Tex. Mar. 7, 2025) (citing *Porter v. Lowe's Cos.*, 731 F.3d 360, 364 (5th Cir. 2013)).
[72] ROA.1094-96; *Miller*, 2025 WL 744480, at *10-11.
[73] ROA.526, 528.

He was removed from managing trade organizations.[74] He lost managerial authority over direct reports and contractors.[75] His compensation was reduced by 4.9%—along with every other legacy Anadarko employee.[76] And he lost hiring and firing authority.[77] Nearly every facet of Miller's working life changed following the Acquisition. Miller's is the classic change of control benefits case.[78]

### A.    Miller's expenditure authority is reduced by 99%.

Courts have found that budget-related reductions constitute a change in control.[79] The trial court here, however, did not address Miller's reduced expenditure authority at all. This alone was error because had it done so, the trial court could have only concluded that Miller experienced a Good Reason event. For this reason,

---

[74] ROA.527.

[75] ROA.527.

[76] ROA.528.

[77] ROA.527.

[78] *See, e.g., Hoff,* 2023 WL 8166680, at *5–9 (plaintiff entitled to separation benefits under the Anadarko COC plan because his project budget was diminished); *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 634 (7th Cir. 2001) (plaintiff entitled to severance under ERISA plan's voluntary separation clause because his budget was reduced and his supervisory duties eliminated); *McClure v. Vice President, Hum. Res., Union Carbide Corp.*, CIV.A. H030054, 2005 WL 1214645, at *18 (S.D. Tex. May 20, 2005) (finding that when the employer took away the employee's budget, staff, and membership on the plan management team, it eliminated material components of his authority); *Daubertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 829 (7th Cir. 2004) (reduction of, among other things, executive's budget, management, and hiring and firing authority, constituted "reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities" so as to trigger severance benefits under ERISA plan, despite "addition" to position responsibility for daily visits to sites managed).

[79] *Id.*

the Court should reverse and render judgment finding Miller is entitled to separation

benefits under the Plan.[80]

Before the Acquisition, Miller's expenditure authority was between $2

million and $8 million, depending on the type of expenditure.[81] After, it was less

than 1% of that amount.[82] Miller provided a chart to the Plan Administrator

contrasting his expenditure authority before and after Acquisition and included

specific examples of expenditures that were approved on a regular basis.[83]

The Committee does not dispute that Miller's expenditure authority was

reduced by 99%. It does not dispute that Miller's ability to approve expenditures was

material to his duties and responsibilities. Nor does it dispute that the 99% reduction

was a material and adverse reduction. The undisputed facts applied to the

unambiguous Plan compel only one conclusion: Miller is entitled to separation

benefits.

The Committee denied that Miller's expense reduction resulted in a Good

Reason event because the reduction was temporary, not directed specifically toward

---

[80] "[W]hen the district courts 'findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue," *Pullman-Standard v. Swint*, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), in which case reversing and rendering is the proper course, *Meche v. Doucet*, 777 F.3d 237, 246-47 (5th Cir.), *cert. denied*, -- U.S. ---, 136 S.Ct. 111, 193 L.Ed.2d 38 (2015)."
[81] ROA.526.
[82] ROA.526.
[83] ROA.526.

Miller, and resulted from economic factors.[84] But none of these arguments are supported by the Plan for two reasons.

**1.    *The Plan doesn't exclude temporary reductions in duties or authority from Good Reason.***

First, the Committee's argument that temporary reductions in duties and responsibilities do not constitute Good Reason has no basis in the Plan. In fact, it violates the Plan. The Committee does not base the argument in the Plan. Instead, the Committee looks to documents created after the Acquisition referred to as Examples, which state that, to be considered a Good Reason, a "change to duties must be permanent."[85] The Examples purport to interpret the Plan such that "short-term reduction in duties due to lack of work, transition, reorganization, or similar matters does not qualify [as Good Reason]."[86] The contrasting Examples provided that "work slows down while management reviews work processes" during the integration of the companies, which is temporary, compared with circumstances where a "supervisor states that one or more job duties held by the employee has been taken away," which is a "permanent change."[87] In denying Miller's claim, the Committee reasoned:[88]

> The Committee discussed the Claim and the operations in the GOM with Mr. Kershaw and Mr. Hamza. Mr. Kershaw explained that

---

[84] ROA.442, 832.
[85] ROA.381.
[86] ROA.381.
[87] ROA.381.
[88] ROA.442.

drilling temporarily stopped due to the significant decline in oil prices as a result of the COVID-19 pandemic. This caused Oxy to take temporary steps to preserve capital, including temporarily reducing the budget authority of many employees. These steps were temporary and were required in order to protect the viability of Oxy. As the economy recovered, drilling began again in October 2020, and all budget authority was reinstated.

Prior to the pandemic, the Committee determined that temporary changes do not constitute Good Reason events under the COC Plan and issued Examples that reiterated this point to all Anadarko employees in September 2019. *See* [Examples].

But the Examples are inconsistent with the Plan. And the Examples state that they are "intended to constitute general information" and subject to the Plan, which controls.[89] So in all events the Plan controls. Not to mention, the Committee never supported in the administrative record that changes were temporary.

The Plan unambiguously limits the Committee's discretion to interpret the Plan to a few circumscribed categories, none of which are present. In all other circumstances the Plan explicitly requires that the Committee use the terms' "intended meanings."[90] "[Courts] interpret ERISA plans 'in their ordinary and popular sense as would a person of average intelligence and experience.' In other words, [courts] must interpret ERISA provisions as they are likely to be 'understood by the average plan participant, consistent with the statutory language.'"[91] Courts

---

[89] ROA.381.
[90] ROA.356.
[91] *Crowell v. Shell Oil Co.,* 541 F.3d 295, 314 (5th Cir.2008) (quoting *Tucker v. Shreveport Transit Mgmt. Inc.,* 226 F.3d 394, 398 (5th Cir.2000)) (alteration omitted).

must also ensure that term language is "given its generally accepted meaning if there is one."[92] No language in the Plan limits Good Reason to a permanent change, or implies that a temporary change cannot be a Good Reason. In fact, the opposite is true.

The Plan sets short timelines for an employee to terminate their employment after any change in employment to be considered for severance benefits. The Plan requires that the "Participant terminate[] his or her Employment within ninety (90) days of such occurrence" in order for the occurrence to be considered a "Good Reason that could entitle the employee to severance benefits.[93] The Plan does not provide an extension to this termination period. Nor does the Plan include a force majeure clause or similar term that could be applied.

Instead, the Plan includes an explicit provision specifying temporary occurrences that do not constitute Good Reason. With respect to an employee being required to travel more often after the Change of Control than before the Change of Control, the Plan explicitly "excludes assignments or positions that might require temporary travel for a specified, short duration of time."[94] And while the Plan includes temporal limitations on travel, it does not include temporal limitations on

---

[92] *Chacko v. Sabre, Inc.*, 473 F.3d 604, 612 (5th Cir. 2006) (cleaned up).
[93] ROA.341.
[94] ROA.339.

diminishment of duties and responsibilities or any other Good Reason.[95] Thus, the

Plan excluded specific temporary circumstances where it intended to exclude them,

and did not generally exempt temporary changes from constituting Good Reason.

The Tenth Circuit put it succinctly in *Hoff*:[96]

> Oxy's reliance on the Plan Interpretation document to make this point is telling, since the Plan itself says nothing about whether a 'permanent' reduction in job duties is required. And that makes all the difference, since 'an ERISA benefit cannot be a moving target where the plan administrator continues to add conditions precedent to the award of benefits.' This court has 'repeatedly rejected efforts to stray from the express terms of a plan, regardless of whom those express terms may benefit.' In fact, the terms of the COC Plan document underscores this very point, since that document explicitly states that it is subject to the terms of the COC Plan document, and if there are any differences between the Examples and the Plan, the Plan controls. That statement forecloses Oxy's reliance on the Plan interpretation document since the Plan's terms take precedence, and the Plan does not state that temporary workload reductions do not count as 'material' and 'adverse.'

Hoff's analysis makes sense. The Plan terms control. And the Committee

shouldn't be able to change or add to the Plan terms through "interpretive"

documentation after-the-fact. And this Court can reach the same conclusion whether

reviewing *de novo* or for abuse of discretion because the Plan terms don't support

the Committee's decision.[97]

---

[95] ROA.339.

[96] *Hoff*, 2025 WL 400517, at *7 (cleaned up).

[97] *Egert v. Connecticut Gen. Life Ins.,* 900 F.2d 1032, 1037–38 (7th Cir. 1990) (holding that guidelines contradicting a plan's requirements were arbitrary and capricious.).

### 2. *The Plan does not excuse Good Reason for Covid-19 or other changed economic circumstances.*

The Committee also pointed to the Covid-19 economic environment as an excuse for Good Reason. But just like temporary changes, the Plan doesn't refer to changing economic conditions as an excuse of Good Reason. Good Reason hinges on duties and responsibilities before Acquisition and duties and responsibilities after Acquisition. No reason at all is required to trigger Good Reason. In fact, the reason could be something other than the change of control. The Plan doesn't distinguish between reasons.

Again, the Tenth Circuit in *Hoff* squelched this exact argument,[98]

> As to Oxy's claim that the pandemic caused an economic downturn that limited the availability of large projects, that argument is irrelevant under the Plan. The Plan only asks (1) whether a change of control occurred (it did), and (2) whether Hoff suffered a material and adverse reduction in his job duties compared to what he enjoyed immediately prior to the Change of Control (he did). The Plan had no force majeure clause for a global pandemic, and it made no exception for a company's choice to slash an employee's job duties in a material and adverse way because of reasons outside the company's control. Even the Plan Interpretation document, which Oxy issued after the acquisition, did not state that a 'material' and 'adverse' diminishment in job duties must be due to the change of control itself.

Just as temporary reductions don't excuse Good Reason, Covid-19, or other changing economic factors don't either. This Court should reverse and render judgment in Miller's favor based on his changed expense authority alone.

---

[98] *Hoff*, 2025 WL 400517, *7.

**B.     Miller is excluded from building and maintaining trade-organization relationships.**

The trial court recognized that Miller had authority to select and approve trade association alliances for Oxy before the Acquisition.[99] And that he did not after the Acquisition.[100] But the trial court did not consider his reduction in duties or authority "Good Reason" under the Plan for two reasons. First, the Committee stated that selecting and approving trade organizations was not a significant aspect of his role.[101] And second, he was excluded from selecting and approving trade organizations due to "fluctuations in business needs."[102] But the administrative record only supports that advocacy was a significant aspect of Miller's role. And fluctuating business needs is no exception to Good Reason.

*1.     Building and maintaining trade organization relationships was a significant part of Miller's responsibility before the Acquisition but not after.*

As leader of the advocacy team before the Acquisition, Miller was charged with identifying and consummating new business relationships with trade associations.[103] Trade associations included the Offshore Operators Committee, American Petroleum Institute, Louisiana Mid-Continent Oil and Gas Association,

---

[99] ROA.1095; *Miller*, 2025 WL 744480, at *11.
[100] ROA.1095; *Miller*, 2025 WL 744480, at *11.
[101] ROA.1095; *Miller*, 2025 WL 744480, at *11.
[102] ROA.1095; *Miller*, 2025 WL 744480, at *11.
[103] ROA.525.

and the International Association of Geophysical Contractors, among others.[104] Miller obtained the necessary approvals, and approved invoices for payment to these business relationships.[105] And after the relationship was consummated, Miller made the cost-benefit analysis and provided recommendations to the Regional Vice President on whether to continue participation.[106] And Miller wasn't simply a back-office player. He partnered directly with these associations on projects and held officers positions on them.[107] Not only was this work a crucial responsibility and duty of his, but it was important to Miller professionally because he had the opportunity to interface with influential members of his working community on issues that were important to the industry.

Miller's supervisor, Alan Sanders, confirmed all the above.[108] Sanders was Regional Vice President for Gulf of Mexico for Anadarko, and he stayed on with Oxy after the Acquisition.[109] Sanders confirmed that "[Miller] was a leader on the advocacy team…[a]nd it was his responsibility to obtain approvals and approve invoices, report on analysis and provide recommendations regarding continued relationships."[110] In Sander's words, "[t]hese trade organizations represented key

---

[104] ROA.525.
[105] ROA.525.
[106] ROA.525.
[107] ROA.525.
[108] ROA.541.
[109] ROA.541.
[110] ROA.541.

business relationships."[111] And we know the same was true for Oxy after the Acquisition because Miller was replaced by Oxy's Vice President of Land, Tom Janiszewski.[112] In other words, the role was important enough to fill with the Vice President of Land—a high level executive. This proves the weight of the responsibility.

The Plan Administrator however "discussed Mr. Miller's involvement with the trade associations and did not think that Mr. Miller's overall involvement was not [sic] a material part of his duties and responsibilities as trade association alliances were not a significant part of the Regulatory oversight function that was the core of Mr. Miller's duties and responsibilities."[113] These few sentences are the sum of the Committee's assessment. But the Committee report shows that the only information it received about Miller's pre-Acquisition duties and responsibilities for Advocacy was from Sanders.[114] And Sanders confirmed that Miller's role with the trade associations was integral. The Committee's statement that Miller's duties and responsibilities for trade association alliances were insignificant to "the core" of his duties and responsibilities is unsupported. The only evidence in the record shows the opposite is true. After all, Miller was Director of Regulatory Affairs *and* Advocacy

---

[111] ROA.541.
[112] ROA.527.
[113] ROA.832.
[114] ROA.498-99.

for GOM. He managed the development of the advocacy program, budgeted the advocacy program, and approved over $2,000,000 in invoices to build the advocacy program just before the Acquisition.[115] Under a *de novo* or arbitrary-and-capricious standard of review, Miller's exclusion from developing and working with trade organizations is a Good Reason event because the Committee can show no basis for its statement. This is the definition of arbitrary.[116] Much less based on "substantial evidence."[117] It was in fact made based on no evidence at all – and contradicted by the only evidence presented which was Sanders' statement. The Court can reverse and render because Miller suffered a diminishment in his duties and responsibilities cultivating trade organizations.

### 2. *Fluctuating business needs does not excuse Miller's diminished role in selecting and maintaining trade organization relationships from Good Reason.*

As explained above, changing business needs is no excuse to Good Reason under the Plan terms. For the same reasons changing business needs, or Covid-19, did not excuse Miller's diminished expenditure authority from Good Reason, they do not excuse his removal from the advocacy portion of his responsibilities.

---

[115] ROA.526-28.

[116] *Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) ("A decision is arbitrary if it is made without a rational connection between the known facts and the decision.").

[117] *Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) ("In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence.").

### C.     Miller is removed from executive-level strategy and personnel input over the Gulf of Mexico Asset.

Before the Acquisition, Miller was a voting member of Anadarko's Gulf of Mexico Management ("GOM") Committee.[118] After the Acquisition, he was removed from the Management Committee, and allowed to attend larger weekly staff meetings, where he no longer had voting rights on issues impacting the Gulf of Mexico asset.[119] The trial court framed the distinction as a dispute of fact, and giving discretion to the Committee, found in its favor.[120] But the trial court was wrong because the issue is not over the facts. Only of conclusion. And the Committee's conclusion was not based on evidence.

The undisputed facts are that pre-Acquisition the GOM Management Committee met bi-weekly to determine the strategies for managing the Gulf of Mexico asset, promotion reviews, and compensation reviews for GOM employees.[121] Miller worked hand in hand with the entire management team on company defining decisions, including with Allen Sanders (Miller's supervisor and Regional Vice President for Anadarko) and Pat McGrievy, formerly the Director of GOM Asset Development.[122] Miller was a member on the Committee reporting directly to senior executives.

---

[118] ROA.525.
[119] ROA.832.
[120] ROA.1096; *Miller*, 2025 WL 744480, at *11.
[121] ROA.525.
[122] ROA.525.

Sanders confirmed that Miller held "high level strategy and personnel input under [his] supervision, along with the Gulf of. Mexico Operations leadership team."[123] And that Miller "accurately stated that he had a leadership role in GOM operations covering more than 300 staff members…."[124] McGrievy likewise "stated that [Miller] was included in the GOM Management Committee and that the committee changed and was technically no longer in existence after the [Change of Control]."[125] McGrievy further confirmed that "[t]he group discussed personnel and strategy as it related to GOM Operations…"[126] And that "the GOM Management Committee was led by Alan Sanders…"[127] So Committee understood that Miller was a member of the GOM Management Committee and that he provided valuable input on GOM asset strategy and personnel decisions, including direct voting input on decisions for the GOM asset, to his direct supervisor Alan Sanders. But after the Acquisition, the GOM Management Committee went away. This is enough to find Good Reason.

But the Committee determined that Miller did not experience Good Reason because he was allowed to attend the weekly staff meeting portion of the Gulf of Mexico ELT committee post-Acquisition.[128] To be clear, Miller was not a member

---

[123] ROA.541.
[124] ROA.541.
[125] ROA.831.
[126] ROA.831.
[127] ROA.831.
[128] ROA.832.

of the Gulf of Mexico ELT committee post-Acquisition. He was allowed to attend staff meetings. He could not vote on issues. And he was not even allowed to sit in on high level executive meetings. His role, influence, and experience on executive level committees was significantly diminished compared to his membership on the GOM Management Committee.

The Committee "indicated that overall exposure to management and executive leadership and the opportunity to have input and influence did exist with the GOM ELT and that Miller's participation on the GOM ELT was not a diminishment of his duties and responsibilities."[129] But the Committee's broad statement is unsupported by any evidence. In fact, the Committee doesn't point to facts to support the statement. Nothing to support that Miller's "overall exposure" to management and executive leadership existed. Or that Miller's participation was "not a diminishment of his duties and responsibilities."

But there's no dispute that Miller was on a smaller executive management team, reported directly to the leader of the team (Sanders), and actually voted on the direction of the asset before the Acquisition. Yet after the Acquisition, Miller was invited to some, but not all, of the meetings, was in a larger group (diluting his voice), and was not entitled to vote on issues related to the direction of the GOM assets. Even under an abuse-of-discretion standard the Committee's decision can't

---

[129] ROA.832.

survive because it's not based on evidence – much less substantial evidence. And in fact, the only evidence proves that Miller's executive committee duties and responsibilities were diminished. The Court can reverse and render on this basis.

### D.     Miller's compensation is reduced by 4.9%.

Miller, along with all legacy Anadarko employees following the Acquisition, experienced a 4.9% reduction in compensation.[130] The trial court found that "[t]he Committee determined that Plan language carved out benefits and incentive compensation from base salary; this determination was not an abuse of discretion."[131] But the trial court either misinterpreted the Plan language, or gave the Committee discretion to interpret unambiguous Plan terms because a material reduction in base compensation constitutes Good Reason under the Plan.

Separation benefits are triggered under the Plan when "Participant's Base Salary is materially reduced in comparison to the Base Salary enjoyed by the Participant immediately prior to the Change of Control…"[132] There is no dispute that Miller's base salary was reduced by 4.9% by Oxy after the Acquisition. The Committee, however, broadly stated that "[t]he Committee previously determined that a 4.9% reduction in compensation is not a material reduction. The COC Plan must be interpreted by the Plan Administrator, and this review resulted in the

---

[130] ROA.530.
[131] ROA.1098; *Miller*, 2025 WL 744480, at *12.
[132] ROA.339.

determination that 4.9% is not material. Therefore, the 4.9% decrease does not constitute a Good Reason event."[133]

Again, the Committee does not have discretion to interpret unambiguous Plan terms. Such discretion would effectively allow the Committee to rewrite the Plan on its own terms after-the-fact. The Plan provides that a material reduction in base salary constitutes good reason, and this Court should uphold the Plan's plain language.

Beyond upholding the plain language, the Committee's decision can't be supported by evidence either. Nowhere in the record is there any analysis from the Committee on how it determined 4.9% was immaterial. No studies, no polls, no consideration at all. Nowhere in the record is there any analysis from the Committee on why 4.9% was chosen, instead of 5%, or 4.8%. As best we can tell, the number was drawn randomly. Without analysis, or some level of backup, the Committee's bald determination is reversible under any standard. The reason is the Committee's decision is not based on substantial evidence.[134] It's based on no evidence. Without substantial evidence supporting why 4.9% is an immaterial reduction in pay, Miller's reduction constitutes a Good Reason.

---

[133] ROA.536.

[134] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) ("Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations."); *see also Mobile South, LLC, v. Roswell*, 574 U.S. 293, 301 (2015) ("The statutory phrase "substantial evidence" is a "term of art" in administrative law that describes how "an administrative record is to be judged by a reviewing court.").

## CONCLUSION

This Court should avoid a circuit split and align with the Tenth Circuit in *Hoff*. This Court's decision in *Gift* is not binding, and offers no analytical basis to divert from *Hoff*. Nor is *Gift* factually similar to this case like *Hoff* is. For these reasons, *Gift* is no reason to cause a circuit split. The Court should align with *Hoff* and reverse and remand in Miller's favor.

Respectfully submitted,

**LAWSON & MOSHENBERG PLLC**

*/s/ Nicholas R. Lawson*
Nicholas R. Lawson
Avi Moshenberg
2301 Commerce Street, Suite 200
Houston, TX 77002
(713) 449-9644
nick.lawson@lmbusinesslaw.com
avi.moshenberg@lmbusinesslaw.com

***Attorneys for Plaintiff—
Appellant Brad Miller***

37

## CERTIFICATE OF SERVICE

I certify that on June 17, 2025, a copy of the foregoing was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record who have appeared.

*/s/  Nicholas R. Lawson*
Nicholas R. Lawson

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 8,050 words, excluding the parts exempted by Fed. R. App. P. 32(f), as counted by the software used to prepare the document.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/  Nicholas R. Lawson*
Nicholas R. Lawson